Our second case this morning is Levitin v. Northwest Community Hospital. The question before this court today is did Dr. Levitin present sufficient evidence to establish that there is a question for a jury that she is a de facto employee or was a de Principally, the question before the court is does the evidence that Dr. Levitin-Proffert demonstrate that Northwest Community exercised that level of control over her practice that effectively made her an employee under the case law? Dr. Levitin would argue the answer is emphatically yes. The district court and in fact Dr. Levitin would submit that if the facts of this case do not qualify to bring her within the definition of a de facto employee for purposes of receiving the protections of Title VII, no staff physician will ever receive those protections. And yet this court has said in Alexander that there are those situations where staff physicians do deserve the protections of Title VII. Ms. Boker, you're seeking to apply the economic realities test here and the first factor says that the extent of an employer's control and supervision here? And is there a distinction between control and supervision for purposes of that test? We are arguing both, Your Honor. We are arguing both they controlled as well and ultimate control, depriving her of her patients, interfering with her ability to treat patients, taking her patients away, controlling her practice by repeatedly reviewing and re-reviewing and also in a supervisory manner, and this is addressed in the Solomon opinion, ongoing continuing supervision. Starting based on Dr. Kohler's declaration in 2004, Dr. Levitin's cases were reviewed at a more stringent basis, both in terms of the number of cases reviewed as well as the criteria applied to her cases compared to any other general surgeon. And the case law has said that control is the most important factor in determining economic realities. What impact does supervision have? Control and supervision are often linked together. Is there a distinction between the impact that supervision should have in assessing economic realities versus control? I think in this particular case, Judge, it's the ongoing continuous nature of supervision and the increasing levels of supervision of reviewing and re-reviewing cases that had been previously reviewed for the purposes of exercising the control over her practice, depriving her of her ability to treat her patients. So I think both factors apply in this case and I think it is this continuing nature of the level of supervision. The bylaws in this case, in fact, imposed on the individual defendants the duty to continuously survey Dr. Levitin's practice, other general surgeons' practice. The difference being in this case, the level of supervision over Dr. Levitin was different than any other general surgeon. So she might have been an employee whereas other general surgeons with admitting privileges at the hospital would not be employees. Agreed. On this record, Your Honor, at least based on the declaration of Dr. Kohler, the differing standard of review over Dr. Levitin's cases began as early as 2004. So the discrimination itself is what transformed her into an employee. I believe that that evidence goes to both questions, both whether she was discriminated against but also whether the level of supervision and ultimately control for purposes of defining her as a de facto employee. And why is that a sound interpretation of Title VII? Title VII clearly contemplates that there is some set of circumstances where an individual is in fact, although a staff physician in this case, a de facto employee for purposes of the terms and conditions of the workplace. And how do you get that from the text of Title VII? I'm not describing the text of Title VII because clearly it applies to employers and employees. Right. You're asking us to hold that the facts of the discrimination claim itself, in other words, the discriminatory actions that form the basis of the Title VII claim decide the question of whether the plaintiff was an employee. Which is, as the district judge in this case pointed out, logically prior to the question of whether there was discrimination at work. The question of employee status comes first and is not determined by the discriminatory acts. It's determined by the contractual relationship between the parties. I have two responses to that. Solomon teaches, Your Honor, that the level of supervision and control over a case can begin with the retaliation. Right. So why is that a sound interpretation of Title VII? Because at that juncture, the staff physician is no longer... I'm not talking about this specific case. I'm talking about in general terms. Let's take it outside the hospital context. Why should the discriminatory acts determine the question of employer-employee status? Which really is a question of what the contractual relationship was between the parties. That's true. But in this case, Judge, I would say, and it's hard to take it outside of a hospital setting, the hospital had a policy. It protected, in theory, all physicians, staff or otherwise, to grant them the right to a safe environment to operate on or, in this case, operate on and treat their patients. So the disruptive physician policy of the hospital granted that right to all physicians equally. It was not applied equally. And the factors that this court looks at under Knight in assessing is somebody truly an independent contractor or, in fact, in substance as opposed to form. In substance is the staff physician treated in such a fashion that converts them into an employee? And this court has recognized that that is a circumstance that can exist in the Alexander decision. That was really just a rhetorical question. That wasn't any sort of legal holding? No. I understand the court's concern. What is it that distinguishes these situations for purposes of when does a staff physician who is ordinarily an independent contractor become an employee? And obviously, it's a serious question of fact. It requires a looking at all of the circumstances. But at least in the court's analyses, that level of control and supervision that is exercised is considered to be the most important factor. It is to be weighted differently. In this case, the district court error largely is that it did not look at the evidence in the light most favorable to Levitin. It weighed evidence and determined it to be unpersuasive. That is not the case. Here is the kind of argument she makes. I'm deciding it's unpersuasive. He stops his analysis. What's the evidence that what the hospital did had any kind of control over what the doctor was doing during her surgeries? I understand your arguments about supervision and impacting her. But in the surgeries, is there any evidence that they were impacting or controlling what she was doing with respect to her patients during those surgeries? Yes, there is. There is evidence that Dr. Conway barged into the surgical suite during the course of the surgery, demanding answers, criticizing judgment, asking questions. Was that on one occasion? That was on one occasion. But there were prior occasions on which he barged into the surgery, challenged her treatment, criticized her judgment, told a patient that she had had disastrous outcomes, which was false, therefore don't have surgery with her, caused at least two patients to switch their surgeries to them. This was all without basis, all without any quality of care reasons. I have reserved five minutes for my rebuttal time. That's fine. I see that I've moved into it. That's... Mr. Katsaros? Did I pronounce that correctly? Yes, thank you. May it please the court, counsel? With respect to a couple of issues that the court inquired of Ms. Bogart, we disagree with the appellant's presentation. The retrospective review of a certain number of Dr. Levitin's cases was not continuous supervision. In 2009, the first peer review was launched, and the medical executive community came to the conclusion that nothing should be done to impair her privileges. They reviewed it, and they closed the file. What prompted the second peer review in 2008 was the choking case. Professionals, two professionals, filed reports that she started the surgery when the patient wasn't under the anesthetic. That, we submit, is not continuous supervision. And, as that peer review process continued for about almost two years, the Judicial Review Committee, which appellant has always complimented in her briefing, found in five pages of analysis that this retrospective review was not sham, that Drs. Soper, Lauren, and Conway were not involved in that peer review, and that the MEC, the Medical Executive Committee, had a basis for starting that investigation based on the complaints about her medical work. So, we contend the record does not support continuous supervision. Is there a difference between supervision and control under the economic realities test? I think supervision could be a key factor in finding control. I think control, according to the precedent in the circuit, is the most important factor under night. I think supervision, to the extent of supervision, would be a factor in determining that element. If you'll permit me a metaphor, I think the best way to look at the Leviton case is Leviton as a baseball player. She steps up, she hits the ball off the vines in Wrigley Field, thinks she's going to hit a double. Her mistake is she doesn't touch first base. The umpire rules her out. That's the problem that the appellant has here. Regardless of her claims of disparate treatment, which is how the argument started, which are disputed, she properly fell victim to summary judgment because she could not establish, under Rule 56, that she had an employment relationship with the hospital, thereby invoking the protections of the statute. We submit to you that this court, in its Alexander v. Rush decision, sets forth the framework for deciding the Leviton case. We believe that this should be the result that comes here should be an affirmance like there was in Alexander. Do you agree that if Solomon was the law of this circuit, that there would be an issue effect on the employer-employee relationship? Your Honor, I think that after reading these cases several times, I don't think that the Solomon test is substantially different from the Alexander test or the decisions reached in the other Court of Appeals. I think the line drawn by the Court of Appeals, Seventh Circuit and your brother and sister circuits, are that as long as the hospital oversight, which often is required by federal regulators or third-party insurance companies, as long as it doesn't step over the line into telling a physician how to do her surgery, then you don't get the control required by Knight, Ost, and Alexander. So the control has to be actually in the surgical room? Right. Of the manner and means of doing the surgery. That is what we submit. And that's the distinction between Solomon and Leviton and Alexander. Because in Alexander, the hospital didn't cross the line. In our case, we never went into and told her how to practice. In fact, in her deposition, page 273, sentence 1, she says, I decide what to do as a surgeon. At 276, 16 to 17, I decided about the actions that I take on my part as a surgeon. 277, 2 to 3, the proper surgical approach is my responsibility. Now in Solomon, Our Lady of Victory Hospital, this is what they did. They didn't withdraw privileges. They told her, Dr. Solomon, we're putting you in a re-education program. And in the course of that re-education program, she was a GI specialist. You're going to do the following. You're going to do esophageal dilatations. You're going to time your outpatient endoscopies. We're going to tell you what medications to use on your patients. And we're going to recommend changes to your practice, which according to the record, impacted the revenue generated by the hospital. We have none of that at Northwest Community Hospital. What about Dr. Sofer's comment that he was going to start reviewing her surgeries prospectively? He did say that. And then in that deposition testimony, he said, I would only review them to see if the scheduled surgeries were within the scope of her credentials. And he never actually did it. He never told her, don't do the surgery. He was merely trying to make sure that nobody did a surgery for which she wasn't credentialed. Which hospitals are required to do? What's the first defendant named in a medical malpractice suit? The hospital. And then the various doctors. The hospital has to have some oversight responsibility. But it is that line between telling a physician what to do and then doing retrospective reviews if concerns are raised. And that's all that Northwest Community Hospital did. At pages 229 and 230 of the Second Circuit Opinion in Salomon, you'll see an extensive explanation of what Our Lady of Victory Hospital required this GI to do. We have nothing like this in our record. Under the Knight, Ost, and Alexander cases of this circuit, Levitin, we submit, is an independent contractor and not protected by Title VII. She's self-employed. She owns her own surgical practice. The income that she earned came from her company's billing to insurance companies and patients themselves. Levitin had privileges at five other hospitals other than Northwest Community Hospital. She was not a staff physician. She was the furthest thing from a staff physician. Judge Feinerman, in ruling on summary judgment, found that four of the five factors in the economic realities test weighed in favor of independent contractor non-employee control being the most significant one. What impact should the expert report have here? Dr. Levitin had pretty strong expert testimony where the expert opined that the doctor had been subjected to a greater degree of scrutiny than other doctors. What impact should that have on the control factor of the economic realities test? We submit to you that it should be given very little weight. Why? Because it goes to a disparate treatment analysis and not the predicate, getting to first base, which is, are you an independent contractor or do you have an employment relationship with the defendant? Whether she was treated differently, and we dispute that, we dispute that. Whether she was treated differently than male physicians does not reflect on whether she was an employee of this hospital. And that's why we treated those experts with fairly light touch in our brief, because we did not think it was pertinent to the controlling issue that this court will be ruling on. As I said before, the Judicial Review Commission found no proof of sham proceedings and they Ms. Bogart and prior counsel has been making claims of bias, sham litigation from the beginning. And the Judicial Review Committee that she regards so highly found no proof of that. And they analyzed it for six pages. This is docket 215 pages four through nine. They concluded that Dr. Levitin had been given all the due process protections, allowed her by the hospital bylaws. Now the fact that Dr. Soper, Loren, and Conway had leadership positions in this hospital at some point in time does not mean that they were part of some conspiracy to get rid of them. When the 2011 Medical Executive Committee second investigation was touched off by the choking, incident, Soper, Loren, and Conway were completely out of the process. They never voted on any committee. Soper did give testimony, gave some testimony based on personal knowledge to the JRC. Were they present when the votes were made and present during the committee's discussion? I think Soper was excused from the room. Conway was never there. Loren was I don't believe he was in the room, at least when the board of directors voted. When the board of directors voted in January of 2013, I believe he was not in the room. And as to Dr. Conway, the comments made by counsel earlier, Conway's boorish conduct stopped. He was counseled, the leadership of the hospital heard about it, they stopped it, they told him to stop it, and it didn't reoccur after 2010. The withdrawal of the privileges occurred in 2013. We submit that Dr. Levitin lost her privileges because the board decided that on a review of the full record, she posed an unacceptable risk to the patients according to this board of directors, and that her attitude toward peer review was not acceptable. They did not say she wasn't a competent physician, but not unlike professional basketball players, both women and men, who are capable basketball players but not good team players, her privileges were withdrawn. We urge the court to follow Alexander and Oste and Knight, and affirm the decision of the district court. The court has no other questions, I'm prepared to finish early. Thank you. Thank you. I spoke on it. With respect to the supervision question that is asked, I want to be clear on this record. Supervision through the quality control, quality assurance process, as all of the courts addressing this question, occurs as a regular course of the hospital's business, and we don't dispute that. And that process, however, has controls. It has procedural protections for staff physicians, which are that the supervision is for quality of care reasons, within the professional and regulatory environment. This case exceeded, and the level of review went well beyond the quality of care, and in fact, that's the nature of the sham peer review contention. That is, that this doctor was subjected to increasing levels of scrutiny outside the quality assurance process, and in the corrective action process, which was unrelated to quality of care issues. Even Dr. Soper, before the JRC conceded, she had four suboptimal cases in a 10-year career, which should not result in somebody's termination of privileges. That's Exhibit ZZZ. This was a sham peer review, and the evidence which demonstrated that it was, was not before the JRC. The JRC effectively found that Dr. Levitin had been retaliated against at its decision, when it reviews the fact that after complaining about Dr. Levitin defending six years of cases, in going back six years, that it had been looked at, reviewed, and closed. And now she's re-defending them. There is a re-review for absolutely no quality of care reasons, solely because of retaliation. Soper was, at every single step of this process, present and able to participate. He not only crafted, well first of all, he was aware of Conway's harassment. He took no steps as the Chief of the Department of Surgery to curtail it. He drafted the corrective action request to the Medical Executive Committee, on which he was a member. He testified before the 2010 Executive Committee, who found in Dr. Levitin's favor, despite that testimony. He was in the meeting on December 13, 2011, when they voted on the one five-minute procedure, which we dispute their characterization of that. He was in the meeting, signed in, was in the meeting. He was there to discuss it. He was on the board and voted in December 13, 2011. He voted to terminate Dr. Levitin's privileges. He, in turn, was on the Quality Committee, and claims he abstained from voting, but he was there to participate when they reviewed the JRC decision. He was in the board meeting on January 12, 2013, when the Circuit Court told him not to be there, and the circumstances were reviewed. Whether he chose to be voting or not, I think, is not the point. He participated in every step of the process to ensure that the Sham Peer Review process resulted in the termination of her privileges, which is the ultimate control. We would urge this Court to reverse the District Court's grant of summary judgment, and remand it with instructions that Dr. Levitin be given a trial on the merits, including the question of whether she was a de facto employee for purposes of Title VII protection. All right. Thank you. Our thanks to both counsel. The case is taken under advisement.